[812 NYS2d 535]

PAMELA ZITO, Appellant, v GARY ZABARSKY, Respondent.

Second Department, January 24, 2006

APPEARANCES OF COUNSEL

*Samuel & Weininger*, Lake Success (*Mary Beth Ott* of counsel), for appellant.

*Wagner Doman & Leto, P.C.*, Mineola (*Daniel F. Doman* of counsel), for respondent.

## OPINION OF THE COURT

LUCIANO, J.

The plaintiff brought this action to recover damages for medical malpractice against her primary care physician, who treated her, inter alia, for a high cholesterol level. Initially, the defendant prescribed daily 20 milligram doses of the statin drug Pravachol and, thereafter, increased the dose to 40 milligrams. The defendant subsequently changed the plaintiff's cholesterol-lowering medication to the statin drug Zocor, which he prescribed at the highest recommended daily dose, to wit: 80 milligrams.

Shortly after she began taking the 80 milligram dose of Zocor, the plaintiff experienced pain in all of her joints, weakness, and shortness of breath. The plaintiff was eventually diagnosed with the autoimmune condition polymyositis, associated with the existence of the "anti-jo-1" antibody.

The plaintiff alleges that the defendant physician departed from accepted medical practice by prescribing an excessive dose of Zocor, causing her to develop polymyositis.

After the defendant and the plaintiff both testified on the plaintiff's direct case, the trial court conducted a *"Frye/ Daubert"** hearing, to determine whether the plaintiff's experts' testimony relating to the plaintiff's theory of medical causation of her injuries was admissible. Subsequent to the hearing, the testimony of the plaintiff's expert witnesses, whose credentials were not disputed by either the trial court or the defendant, was ruled inadmissible. The sole basis for the court's ruling was

---

* The trial court purported to conduct this hearing based upon *Frye v United States* (293 F 1013 [1923]) and *Daubert v Merrell Dow Pharmaceuticals, Inc.* (509 US 579 [1993]). We note however, that New York has not adopted the *Daubert* standard, but rather continues to adhere to the *Frye* test for determining the admissibility of novel scientific evidence (*see People v Wernick,* 89 NY2d 111, 115 [1996]; *People v Wesley,* 83 NY2d 417, 423 n 2 [1994]).

that the plaintiff failed to produce any medical literature that reported a causal nexus between an excessive dose of Zocor and the development of polymyositis. Having ruled the plaintiff's experts' testimony inadmissible, the trial court granted the defendant's motion, in effect, to preclude the testimony of the plaintiff's experts and pursuant to CPLR 4401 for judgment as a matter of law.

New York courts, applying the *Frye* test (*see Frye v United States,* 293 F 1013 [1923]), permit expert testimony based on scientific principles, procedures, or theories only after the principles, procedures, or theories have gained general acceptance in the relevant scientific field (*see People v Wesley,* 83 NY2d 417, 422 [1994]). Under the *Frye* test, the burden of proving general acceptance rests upon the party offering the disputed expert testimony (*see Del Maestro v Grecco,* 16 AD3d 364 [2005]; *Saulpaugh v Krafte,* 5 AD3d 934, 935 [2004]; *Lara v New York City Health & Hosps. Corp.,* 305 AD2d 106 [2003]).

The trial court correctly concluded that the medical opinion in this case, that there was a causal connection between the allegedly excessive dose of Zocor and the onset of polymyositis, was a novel one, such that a *Frye* hearing was warranted. However, the trial court erred in applying the *Frye* test too restrictively. As a result, the trial court improperly precluded the plaintiff's experts' testimony on the basis that no medical literature expressly reported a causal nexus between an excessive dose of Zocor and the onset of polymyositis.

In that regard, I agree with the statement in the concurring opinion of Justice David B. Saxe of the Appellate Division, First Department, in *Marsh v Smyth* (12 AD3d 307, 312-313 [2004]), that it is not necessary "that the underlying support for the theory of causation consist of cases or studies considering circumstances exactly parallel to those under consideration in the litigation. It is sufficient if a synthesis of various studies or cases reasonably permits the conclusion reached by the plaintiff's expert." As stated in *Beck v Warner-Lambert Co.* (2002 NY Slip Op 40431[U], *6-7), which also involved a novel scientific opinion concerning the causal relationship between the ingestion of a drug and the development of a disease, "general acceptance does not necessarily mean that a majority of the scientists involved subscribe to the conclusion. Rather it means that those espousing the theory or opinion have followed generally accepted scientific principles and methodology in evaluating clinical data to reach their conclusions."

The trial court's determination in this case was based solely upon the fact that the plaintiff's experts cited only a single reference in medical literature to support their theory: a May 1997 article from the Lancet journal which documented the history of a patient who had developed polymyositis, likely induced by simvastatin, the generic name for Zocor. The article reported that a 42-year-old man was prescribed daily 20 milligram doses of simvastatin and thereafter was diagnosed with polymyositis (*id.*). Although this case study lends support to the opinions of the plaintiff's experts that there is a causal nexus between Zocor and polymyositis, the trial court determined that the *Frye* test could not be satisfied without medical literature which expressly reported a connection between an excessive dose of Zocor and the onset of the disease. This determination was an overly restrictive application of the *Frye* test.

While it is conceded that the plaintiff's experts did not produce medical literature which expressly supported their view that an excessive dose of Zocor caused the plaintiff to develop polymyositis, they supported their theory of a causal nexus between an excessive dose of Zocor and polymyositis with generally accepted scientific principles and existing data (*see Selig v Pfizer, Inc.,* 290 AD2d 319, 320 [2002] [in absence of clinical data supporting theory of medical causation, "it was incumbent upon plaintiffs to set forth other scientific evidence based on accepted principles showing a causal link"]). The experts provided the case study of the patient, discussed, *supra,* which linked Zocor with the onset of polymyositis. They explained that a generally accepted possible side effect of statin drugs, including Zocor, is myopathy, which is muscle inflammation, and that myopathy causes elevated release of creatine phosphokinase (hereinafter CPK), indicative of muscle toxicity. It was undisputed that after the onset of the plaintiff's symptoms, her CPK levels were extremely elevated.

Indeed, the defendant physician testified that upon learning of elevated CPK in the plaintiff's blood, he discontinued her Zocor therapy. The plaintiff's experts opined that the inflammation of the plaintiff's muscles caused leakage into her bloodstream of, in addition to CPK, intracellular components, which triggered an autoimmune response causing the development of the "anti-jo-1" antibody which is associated with polymyositis. The plaintiff's theory of medical causation was further buttressed by the temporal relationship between the administration of Zocor and the onset of the plaintiff's symptoms.

Based upon the accepted scientific theory of the dose/response relationship, which holds that both the beneficial and toxic effects of a drug will be greater with increased doses, the plaintiff's experts opined that the defendant's failure to titrate, or slowly increase over time, the dose of Zocor, to achieve maximum benefit with minimal toxicity, was a departure from the accepted standards of medical care and that this departure was causally related to the plaintiff's development of polymyositis. It was, therefore, error for the trial court to rule that this testimony was inadmissible based solely upon the fact that there was no scientific literature linking polymyositis to an excessive dose of Zocor.

Moreover, the trial court, while purporting to credit the deductive reasoning of the plaintiff's experts, apparently believed that the *Frye* test could only be satisfied with medical texts, studies, or other literature which supported the plaintiff's theory of causation under circumstances virtually identical to those of the plaintiff. However, the *Frye* test is not that exacting.

The plaintiff's experts' theory of medical causation in this case was based upon more than theoretical speculation, or a scientific "hunch" (*see Stanski v Ezersky,* 228 AD2d 311 [1996] [expert's testimony as to causation inadmissible where opinion amounted to nothing more than personal speculation]). The plaintiff's experts ineluctably connected the facts of the plaintiff's constellation of signs and symptoms to their deduction that there was a causal nexus between the excessive dose of Zocor and the onset of polymyositis using scientifically accepted methodology and reasoning. The fact that there was no textual authority directly on point to support the experts' opinion is relevant only to the weight to be given the testimony, but does not preclude its admissibility. The plaintiff's experts "set forth other scientific evidence based on accepted principles showing such a causal link" (*Selig v Pfizer, Inc., supra* at 320).

A strict application of the *Frye* test may result in disenfranchising persons entitled to sue for the negligence of tortfeasors. With the plethora of new drugs entering the market, the first users of a new drug who sustain injury because of the dangerous properties of the drug or inappropriate treatment protocols will be barred from obtaining redress if the test were restrictively applied.

Since the plaintiff's experts supported their opinion of medical causation with medical literature, reasoned methodology, and generally accepted scientific principles, the trial court

improvidently precluded their testimony. Accordingly, the judgment is reversed, the defendant's motion is denied, the complaint is reinstated, and the matter is remitted to the Supreme Court, Queens County, for a new trial before a different justice.

COZIER, J.P., CRANE and SKELOS, JJ., concur.

Ordered that the judgment is reversed, on the law, the motion is denied, the complaint is reinstated, and the matter is remitted to the Supreme Court, Queens County, for a new trial before a different justice, with costs to abide the event.