OPINION OF THE COURT
Paul I. Marx, J.
It is ordered that plaintiffs’ motion to preclude is granted, for the reasons which follow.
Plaintiffs Eduardo Nobre, Jr., by his mother and natural guardian, Jennifer Ferraro, and Jennifer Ferraro, individually, brought this medical malpractice action against defendants James Shanahan, M.D., James Brockunier, M.D., and St. Anthony Community Hospital,[1] alleging personal injuries to plaintiffs resulting from defendants’ improper treatment. Dr. Brockunier provided the majority of Ms. Ferraro’s prenatal care but did not participate in the delivery of Eduardo. Dr. Shanahan *911 delivered Eduardo on September 3, 2006. Of relevance to the instant motion is plaintiffs’ allegation that following delivery of Eduardo’s head, he suffered shoulder dystocia,[2] a condition whereby his shoulder became stuck on his mother’s symphysis pubis — a cartilaginous joint at the top center of the pelvic outlet, the last portion of the pelvis through which the infant passes prior to delivery.
Facts
Ms. Ferraro was admitted to St. Anthony for delivery of Eduardo at 12:25 a.m. on September 3, 2006. The delivery notes and deposition testimony of Dr. Shanahan show that Ms. Ferraro was fully dilated at 11:55 a.m., pushed poorly initially but then improved with coaching. The nurse’s entries show that she was pushing well at 1:30 p.m., 2:00 p.m., 2:30 p.m. and 2:40 p.m. There is no note of maternal pushing after 2:40 p.m. There is no evidence of a contraction at 2:45 p.m. when Dr. Shanahan noted delivery of the infant’s head and a turtle sign,[3] indicating shoulder dystocia. Dr. Shanahan initially tried the McRoberts’ maneuver[4] to relieve the shoulder dystocia and performed a 4th degree episiotomy. (Aff of James Shanahan, M.D. ¶ 2.) He stated that when these efforts proved unsuccessful, he followed up with rotation of the infant’s shoulders with his fingers to effectuate delivery at 2:46 p.m. (Id.) Notably, Dr. Shanahan has denied that he applied excess downward traction after the baby’s head was delivered. (Id. ¶ 3.)
Upon delivery, Eduardo was floppy, but he quickly responded to resuscitative efforts. His Apgar scores at one minute and five minutes were 5 and 9, respectively.[5] He weighed seven pounds, 15 ounces and measured 19 inches in length. His head circum *912 ference measured 13 inches, his chest 13.5 inches and his abdomen 13 inches. His right arm was flaccid and a right brachial plexus injury[6] was noted. Plaintiffs alleged in their bill of particulars that Eduardo:
“suffered from Erb’s palsy;[7] shoulder dystocia; fetal distress; lack of muscle control in the arm, hand, or wrist, and lack of feeling or sensation in the arm or hand; inability to crawl without the use of therapeutic devices; low muscle tone and weakness; a limp and/or paralyzed arm neurological injury; immobilized right arm; right sided upper extremity injury; lack of development; decreased sensation, occupational therapy and physical therapy; severe physical dysfunction; pain and suffering; loss of ability to develop independence in activities of daily living; loss of quality and enjoyment of life.” (Plaintiffs exhibit F, book 4, pleadings, tab 10, corrected further supplemental verified bill of particulars ¶ 12.)
*913 The Parties’ Arguments
Plaintiffs move to preclude defendants from arguing at trial that Eduardo’s injuries were caused by the maternal, or natural, forces of labor, i.e., uterine contractions and maternal pushing. Plaintiffs contend that Eduardo’s shoulder dystocia rendered him susceptible to brachial plexus injury from the delivering physician applying lateral traction — a downward or upward or rotational pulling force — to the infant’s head and neck in an effort to dislodge the infant and effectuate delivery. Plaintiffs claim that as a result of Dr. Shanahan’s actions, Eduardo suffered a permanent brachial plexus injury. (See plaintiffs’ mem of law at 8.) They contend that Dr. Shanahan “failed to utilize the appropriate maneuvers to dislodge the [infant’s] anterior shoulder before continuing the vaginal delivery” and “improperly utilized force and traction in attempting to deliver the infant.” (See plaintiffs exhibit F, book 4, pleadings, tab 10, corrected further supplemental verified bill of particulars ¶ 5 [h], [m].)
Plaintiffs allege that Dr. Shanahan applied excessive lateral traction to Eduardo’s neck and head in order to dislodge his shoulder. Plaintiffs state that it has been generally accepted for over 100 years that a permanent brachial plexus injury in an otherwise healthy newborn delivered vaginally is caused by the delivering physician applying lateral traction during a shoulder dystocia.[8] In fact, plaintiffs allege in their bills of particulars that they are relying “on the theory of res ipsa loquitor [sic].” (Id. ¶ 5 [bb].)
Plaintiffs state that in the past 20 years another theory has emerged from defense experts in litigated cases, which contends that in some instances a brachial plexus injury in a newborn can result from the maternal, or natural, forces of labor and delivery. (Affirmation of Joseph M. Lichenstein, Esq. ¶ 4.) Plaintiffs assert that this theory gained some traction after these defense experts published their hypotheses in obstetrical journals, which were then cited in an increasing number of subsequent medical journals. (Id.) Plaintiffs contend, however, *914 that the “hypothesis is unscientific” and critically flawed, because the literature proffered by defendants “is based on a retrospective analysis of cases, where they fail to distinguish permanent BPI [brachial plexus injury] and temporary BPI.” (Id. ¶ 5.) Plaintiffs explain that the distinction between permanent and temporary brachial plexus injury is significant, because the maternal forces of labor, in rare instances, can cause the brachial plexus to experience enough stretch to cause a temporary brachial plexus injury but cannot exert enough force to result in a permanent brachial plexus injury. (See notice of motion, exhibit B, aff of Robert H. Allen, Ph.D. ¶¶ 20-21.) They assert that the hypothesis advanced by defendants in this case has been disproved by quantitative scientific testing conducted by Robert H. Allen, Ph.D., a research professor in biomechanical engineering and gynecology and obstetrics and a well-recognized expert in the area of shoulder dystocia and brachial plexus injuries.[9]
Dr. Allen opined in his affidavit that “mechanically, it is not possible for uterine forces to stretch the fetal brachial plexus nerves to cause a mechanical permanent injury in a cephalic delivery.” (Id. ¶ 28.) Dr. Allen performed “[c]adaver research on 16 brachial plexi in full term infants.” (Id. ¶ 30.) The results of his research “demonstrated that upper brachial plexus ruptures require at least 40 pounds of lateral force on the head, and increasing lateral forces to more than 80 pounds causes lower and middle root ruptures and avulsions.” (Id.) He stated that “a fetal nerve needs to be stretched 50% or more beyond its original length for it to rupture and thereby cause a permanent injury.” (Id.) Dr. Allen conducted an experiment, the results of which he published in 2007, wherein he simulated the second stage of labor and “measured anterior and posterior brachial plexus stretch as the fetus [was] pushed through the pelvis [using an amount of uterine force comparable to uterine forces in actual labor] ... for routine and shoulder dystocia deliveries.” (Id. ¶ 34.) He found that the amount of brachial plexus stretch as the infant moves through the pelvis varies between 0 and 25%, “which the is the normal amount of stretch when the head rotates or flexes to one side . . . and is not injurious.” (Id. *915 ¶ 36.) Dr. Allen also found that the amount of “stretch is significantly less for shoulder dystocia deliveries than for routine deliveries as a result of maternal contractions and pushing.” (Id.) He concluded that a permanent brachial plexus injury “can only result from physician applied lateral traction after delivery of the fetal head.” (Id. ¶ 37.)
Plaintiffs requested the court to conduct a hearing under Frye v United States (293 F 1013 [DC Cir 1923]) and Parker v Mobil Oil Corp. (7 NY3d 434, 447 [2006], rearg denied 8 NY3d 828 [2007]). Plaintiffs urge the court to follow the decision in Muhammad v Fitzpatrick (91 AD3d 1353 [4th Dept 2012]), which applied Frye and Parker in a brachial plexus birth injury case and precluded the defendants from offering the theory of causation that is at issue here. Muhammad held that the defendants were not able to establish that the theory they espoused was generally accepted within the relevant medical community, as required under Frye.[10] The Court also found that even if the theory was admissible under Frye, it still needed to satisfy the question of admissibility that applies to all evidence, as provided for in Parker (at 447), “whether there is a proper foundation — to determine whether the accepted methods were appropriately employed in a particular case.” (Muhammad at 1354, citing Parker at 447.) The Court determined that Parker was applicable even though Parker was a toxic tort case. (Id., citing Lugo v New York City Health & Hosps. Corp., 89 AD3d 42, 62 [2d Dept 2011], and Rowe v Fisher, 82 AD3d 490, 491 [1st Dept 2011].) Adapting Parker’s causation test to the case before it, the Court stated that
“the opinion of defendants’ experts on causation should set forth the ‘exposure [of plaintiffs daughter] to a [harmful in útero event], that the [event] is capable of causing the particular [injury] (general causation) and that plaintiff[‘s daughter] was exposed to [a sufficiently harmful event] to cause the [injury] (specific causation).” (Id., citing Parker at 448.)
After applying the test, the Court found that the evidence was properly precluded, because the defendants did not satisfy “the specific causation and general causation prongs.” (Id.)
*916 Relying on Ratner v McNeil-PPC, Inc. (91 AD3d 63 [2d Dept 2011]), plaintiffs assert that defendants bear the burden of proof on their theory of causation. They argue that defendants cannot meet their burden because the analytical gap between the available data and their causation theory is too great to make it sufficiently reliable to present to a jury.
In opposition, defendants contend that the maternal forces of labor theory is not novel and is generally accepted. Defendants explain that “stretch” can cause “a spectrum of injuries,” which their bioengineering expert, Dr. Michele Grimm, stated includes
“neurapraxia (focal damage to the myelin sheath that interferes with nerve conduction but without axonal disruption and is not permanent), axonotmesis (disruption of multiple axonal fibers without myelin or connective tissue disruption), and neurotmesis (complete loss of axonal continuity along with partial or complete discontinuity of the myelin sheath and supporting connective tissue fibers, as occurs in a rupture or avulsion).”[11] (Defendants’ mem of law in opposition at 1, citing aff of Michele Grimm ¶ 13.)
They argue that Eduardo suffered a mild axonotmesis, which they describe as “disruption of multiple axonal fibers without myelin or connective tissue disruption.” (Id.) Hence, they argue, *917 plaintiffs’ attempt to negate their defense of maternal forces is misplaced based on the nature of the injury sustained.
In essence, defendants assert that it is plaintiffs’ theory of the case which is inapplicable,[12] because it is limited to injuries that result from a rupture or avulsion of the brachial plexus nerves. They argue that Eduardo did not experience a rupture or avulsion of the brachial plexus nerves; instead, he suffered axonotmesis, which they characterize as a mild injury. In support of their opposition, defendants submit the affidavit of defendant James Shanahan, M.D.; the affidavit of pediatric neurologist Sandra Forem, M.D.; the affidavit of bioengineer Michele Grimm, Ph.D.; medical literature; the testimony of Drs. Forem and Grimm; and case reports.
Defendants use Dr. Forem’s opinion as a starting point for applying their causation theory by seeking to establish that Eduardo’s injury is mild. Dr. Forem opined, based upon her physical examination of Eduardo,
“to a reasonable degree of medical certainty, that Eduardo Nobre, Jr. could not have suffered avulsion or rupture of the brachial plexus during delivery or at any time in the past. My findings at the time of examination were consistent with a history of a considerably lesser injury, such as mild axonotmesis with excellent recovery over time in the C4-C6 pathways, given the absence of any demonstrable weakness or sensory loss in the distribution of the brachial plexus and Eduardo’s intact and symmetrical deep tendon reflexes.” (Aff of Sandra Forem, M.D. ¶ 4.)
Defendants contend that the degree of injury to Eduardo distinguishes this case from the case relied upon by plaintiffs, Muhammad v Fitzpatrick, which involved a more severe injury of avulsions at three levels of the brachial plexus. Contrasting that level of injury with Eduardo’s mild axonotmesis, defendants argue that the injury here was caused by the forces of labor and not by any action of defendant James Shanahan, M.D. during delivery.
Defendants take the position that Frye is not applicable because the forces of labor theory is not novel and, in any event, their theory satisfies Frye because it is generally accepted. They *918 cite to a 2008 case study by Lerner and Salamon reported in the American Journal of Obstetrics and Gynecology;[13] an article by Dr. Grimm and others looking at the forces associated with shoulder dystocia,[14] which was published in the same journal; an article reporting and commenting on several cases of brachial plexus injury after atraumatic cesarean delivery;[15] an excerpt from Williams Obstetrics (F. Gary Cunningham et al. [23d ed 2009]), which has been recognized as a learned treatise;[16] a 2005 publication by the American College of Obstetricians and Gynecologists;[17] and judicial opinions. Regarding the latter, defendants assert that an expert’s opinion may be determined by a court to be generally accepted on the basis of prior judicial opinions. (See defendants’ mem of law at 13, citing Matter of Lahey v Kelly, 71 NY2d 135, 144 [1987], and People v Scoon, 303 AD2d 525, 526 [2d Dept 2003].) Defendants also maintain that the support they offer for the forces of labor theory of causation — computer modeling, case studies and medical literature — is generally accepted.
Defendants take the further position that plaintiffs have not raised a question under Parker as to whether the forces of labor theory is applicable to this case. (Id., citing Ratner at 72-73.) Defendants contend that ££[t]his case involves nothing more than a question of credibility to be tested at trial by vigorous cross-examination and ultimate determination by the fact finder.” (Id.)
In reply, plaintiffs contend that this case does present a Frye issue, because defendants’ theory that a permanent brachial plexus injury can be caused by the maternal forces of labor is novel and has not been generally accepted in the medical or scientific community. They assert that defendants have presented no literature proving that the theory has general acceptance in the medical community. Plaintiffs also contend that defendants *919 cannot satisfy the causation test set forth in Parker and Muhammad, because they cannot prove the injury threshold or establish a causal connection in this case between the maternal forces and Eduardo’s injury.
The Hearing
Plaintiffs’ application was made on the eve of jury selection. Given the gravity and complexity of the issues presented, the court set a briefing schedule and ordered a hearing. At the hearing held on July 26, 2013 and August 1, 2013, defendants offered the testimony of Drs. Forem and Grimm. Prior to the start of the hearing, plaintiffs informed the court that they would not call any witnesses to the hearing as they did not believe, based upon defendants’ papers, that defendants met their burden of proof on general and specific causation. Plaintiffs decided to rely on the affidavits of their experts, which they submitted with their moving papers.
Dr. Forem, a pediatric neurologist who examined Eduardo on May 6, 2011, when he was four years and eight months old, testified as to her findings of his condition. She testified that at her examination, she observed that he had “a tight right elbow and that he tends to hold his right shoulder lower than his left when seated.” (July 26, 2013 hearing tr at 14, lines 23-25.) She stated that Eduardo received physical therapy as a young infant, which he stopped at some point and then restarted in October 2010. She noted that when he was asked to hop on either foot, he spontaneously did a partial handstand by placing both palms on the floor and lifting his trunk briefly. She stated that this was significant in terms of Erb’s palsy, because it showed no “significant contracture” and “no weakness.” (Id. at 22, lines 15-18.) She found that he had 10 degrees less right elbow extension than left elbow extension, which she deemed to be “functionally insignificant.” (Id. at 26, line 11 through 27, line 9.) Overall, she found “mild tightness of his rhomboids on the right side, minimal right elbow flexion contracture, ... a little bit of posturing, especially when running or when tired ... no residual weakness, no reflex asymmetry, and no significant limitation in the functional use of his right upper extremity.” (Id. at 36, lines 11-16.) Dr. Forem concluded that Eduardo’s brachial plexopathy “was essentially resolved.” (Id. at 36, lines 2-8.)
During the hearing, Dr. Grimm testified that, using a computer model that was originally designed for car accidents, she *920 adapted the model to determine the range of stretch within which injury to the brachial plexus would occur. She explained that her study avoided the limitations of a physical study, like Dr. Allen’s 2007 study, by using the same parameters for the infant[18] and varying the amount of force applied to the infant during each “run.” She stated the amount of stretch on the brachial plexus that puts it at risk of injury was just over 18%. (Grimm hearing tr at 50, lines 8-25.) She also stated that between 25 and 30 pounds of force is created by normal amounts of uterine contractions and pushing during labor. (Id. at 53, line 10 through 54, line 7.) That amount of force, she asserted, is within the range of force that Dr. Allen claimed can produce a permanent brachial plexus injury. (Id. at 55, lines 9-12.) She also stated that the computer model showed that the force applied by contractions and pushing acts in a different direction than the force applied by clinician traction. Thus, the comparison is “not completely apples to apples.” (Id. at 55.)
Dr. Grimm testified that she considered data from animal studies to form her model. (Id. at 87, lines 18-21; at 89, lines 9-12.) In particular, she considered a study that looked at rabbit tibial nerves and another study that examined the nerve root[19] rupture in the spinal nerve roots of adult rats. The studies used optical techniques to measure the range of stretch. She acknowledged that there is no human data to compare it to, but she found these studies of interest because brachial plexus injury in an infant typically occurs in the nerve roots where the nerve exits the spinal canal. (Id. at 63.)
Dr. Grimm also testified that she could not directly relate brachial plexus strain to brachial plexus injury occurrence or severity in actual obstetrical practice for a given individual. (Id. at 163, line 16 through 164, line 8.)
Discussion
Frye Analysis
“In determining the admissibility of expert testimony, New York follows the rule of Frye v United States that expert testimony based on scientific principles or procedures is admissible but only after a principle or procedure has gained general *921 acceptance in its specified field.” (Lugo v New York City Health & Hosps. Corp., 89 AD3d 42, 55 [2d Dept 2011] [internal quotation marks and citations omitted].) A Frye inquiry is concerned with the basis for an expert’s opinion and not whether the particular opinion is sound. {Id. at 56.) In other words, “Frye is not concerned with the reliability of a certain expert’s conclusions, but instead with ‘whether the experts’ deductions are based on principles that are sufficiently established to have gained general acceptance as reliable.’ ” (Nonnon v City of New York, 32 AD3d 91, 103 [1st Dept 2006], quoting Marsh v Smyth, 12 AD3d 307, 308 [1st Dept 2004].)
Decades ago, Frye considered the admissibility of expert testimony based upon the results of a “systolic blood pressure deception test” that used blood pressure readings to determine truthfulness. The court excluded the expert’s testimony because the underlying test was not generally accepted and scientifically recognized in the particular field of psychology and physiology.
Since that time, New York courts have expanded Frye beyond the results of scientific testing and measurement procedures and have applied it to determine the reliability of psychological and physiological theories or syndromes. (Lugo at 57.) Indeed, “New York courts have also applied the Frye test to assess the reliability of an expert’s theory of causation in a particular case.” (Id.)
“When the Frye test is applied to a theory of causation, ‘the court’s concern must be limited to making sure that within the scientific field in question, there is a substantive, demonstrable, objective basis for the expert’s conclusion,’ and that ‘[t]he focus of the inquiry in such an instance should not be upon how widespread the theory’s acceptance is, but should instead consider whether a reasonable quantum of legitimate support exists in the literature for the expert’s views.’ ” (Id. at 62 [adopting Justice Saxe’s concurring op in Marsh v Smyth at 312].)
The challenged theory of causation must be “based upon more than theoretical speculation, or a scientific ‘hunch.’ ” (Zito v Zabarsky, 28 AD3d 42, 46 [2d Dept 2006].)
The parties dispute whether the opinion of defendants’ expert should be analyzed under Frye. Plaintiffs contend that the theory advanced by defendants is novel; defendants contend otherwise. Defendants also assert that their theory should not *922 be subjected to a Frye analysis, because the methodology which underlies their expert’s opinion, consisting of medical literature, computer modeling, animal studies and case reports, is generally accepted in the medical community.
Plaintiffs’ contention that defendants’ theory is novel is at odds with their statement that “[a]bout 20 years ago defense experts, in litigated matters, hypothesized that BPI [brachial plexus injury] occurred in some cases as a result of the maternal, or natural ‘forces of labor.’ ” (Affirmation of Joseph M. Lichen-stein, Esq. ¶ 4.) This court cannot conceive how a theory that has been studied, tested and debated for more than 20 years can be deemed to be novel.[20] Moreover, it should be noted that during that time period, the theory has moved in a direction that has narrowed its scope to whether a permanent brachial plexus injury can be caused by the maternal forces of labor. Defendants’ theory that a mild permanent brachial plexus injury can be caused by the maternal forces of labor is simply a further refinement on a much-debated theory.
Furthermore, this court can discern “no particular novel methodology at issue for which [it] needs to determine whether there is general acceptance.” (.Parker at 447.) Defendants have utilized accepted methodologies, such as animal studies, medical literature and computer modeling, to support their theory. Dr. Grimm acknowledged that the particular animal studies she used are inexact predictors for the stretch capacity of the brachial plexus of human infants, because there is no human data available for comparison. She testified at length about the computer modeling that she has performed with Dr. Bernard Gonik. Dr. Grimm also relied on medical literature discussing brachial plexus injury in infants and case studies, including a case report by Lerner and Salamon, which concluded that a permanent brachial plexus injury can occur in the absence of clinician applied traction or shoulder dystocia.
Plaintiffs claim that the Lerner and Salamon case report is invalid because, contrary to what the authors reported, the case *923 involved shoulder dystocia.[21] The case report was also criticized because the authors failed to reveal the true nature of their involvement in the case; specifically, that one author was the obstetrician and the other author was an expert witness in the litigation of the case. The case report was peer reviewed by the editors in chief of the American Journal of Obstetrics and Gynecology, including viewing a video of the birth. The results of the peer review were that there was “minimal direct vision in the video of the birth” and what could be viewed did not suggest shoulder dystocia. (Affirmation in opposition, exhibit 9.) The reviewers further stated that although the observers of the video did not see “any evidence of shoulder dystocia or ‘soft tissue dystocia’ . . . does not mean that it could not have happened though we seriously doubt that it did given the very short time of the actual birth.” (Id.) The reviewers could not conclude that the study reported false or inaccurate information. Therefore, the study has not been invalidated.[22]
Defendants also relied upon a medical article reporting on cases of brachial plexus palsy in the absence of shoulder dystocia or physician applied traction. (See e.g. Robert B. Gherman, T. Murphy Goodwin, J. Ouzounian, D. Miller and R.H. Paul, Brachial plexus palsy associated with cesarean section: An in útero injury ?, 177 Am J Obstetrics & Gynecology [Issue 5] 1162 [1997].) As stated by the authors of that article:
“Brachial plexus palsy has been noted to occur in the absence of shoulder dystocia and in the posterior arm of infants with anterior shoulder dystocia. The strongest support for the position that factors other than lateral traction on the anterior shoulder are etiologic, however, comes from cases of brachial plexus injury noted after atraumatic cesarean delivery.” (Id. at 1162.)
The authors examined several cases of infants with Erb’s palsy that persisted at 12 months and later, who were delivered by C-section, including one in early labor, and concluded that “[t]he occurrence of such injuries therefore strongly suggests causes *924 other than the usually suspected stretch or avulsion method of injury.”[23] (Id. at 1164.)
The court declines to apply the finding in Muhammad that the maternal forces of labor theory, as presented in that case, did not satisfy Frye. The court is mindful of the principle set forth in Mountain View Coach Lines v Storms (102 AD2d 663 [2d Dept 1984]), that if a case from another department is “the only New York authorit[y] on point . . . the doctrine of stare decisis requires trial courts in this department to follow precedents set by the Appellate Division of another department until the Court of Appeals or [the Appellate Division of this department] pronounces a contrary rule.” (Id. at 664 [citations omitted].) However, after reviewing the motion papers and the hearing transcript in Muhammad, the court concludes that the defendants’ theory in Muhammad as presented in that case was limited by the proof presented to that court in support of the theory. The expert in Muhammad relied on only a portion of the medical literature on the subject considered here. He did not rely on Dr. Grimm’s computer modeling, the Lerner case study or the articles reporting brachial plexus injury in cases where a C-section was performed.
Moreover, factual differences between Muhammad and this case affect the legal issue involved. In Muhammad, the degree of injury was more severe than in this case; there was at least a partial avulsion of the nerves. In this case, the degree of injury is less severe and involves no rupture or avulsion of the nerves. Even plaintiffs describe the causation theory at issue in terms of the degree of injury: if the brachial plexus injury is temporary, then maternal forces can be the cause; if the injury is permanent, then maternal forces cannot be the cause. One could say that the parties agree that the maternal forces of labor can cause a brachial plexus injury, but they disagree as to whether such forces can create enough stretch to result in a permanent injury. Viewed in that light, the factual disagreement which appears “should not [be] resolved as a matter of law by the [court] in the course of [a] Frye inquiry.” (Lugo at 62.)
The Appellate Division in this department has cautioned against applying Frye too restrictively and has held that a causation theory need not be based upon medical literature, studies or medical texts which expressly support the theory at issue. *925 (Zito v Zabarsky at 45-46.) While “a complete absence of any literature or studies supporting the particular causation theory” will result in its exclusion, the expert need not cite cases or studies that have considered circumstances exactly parallel to those in the particular case. (Lugo at 57 [reviewing cases where testimony was precluded: Cumberbatch v Blanchette, 35 AD3d 341, 342 (2006) (“no relevant scientific data or studies”); Lewin v County of Suffolk, 18 AD3d 621, 622 (2005) (“no scientific organization or national board has expressly recognized a causal relationship”); and Hooks v Court St. Med., P.C., 15 AD3d 544, 545 (2005) (no “relevant scientific data or studies showing a causal link”)].)
“ ‘It is sufficient if a synthesis of various studies or cases reasonably permits the conclusion reached by the [defendants’] expert.’ ” (Zito v Zabarsky at 44, quoting Marsh at 312-313.) Indeed, the Appellate Division has gone so far as to state that “[t]he fact that there was no textual authority directly on point to support the experts’ opinion is relevant only to the weight to be given the testimony, but does not preclude its admissibility.” (Id. at 46.) In making its determination under Frye, the court must not decide “ ‘who is right and who is wrong.’ ” (Lugo at 56.) That determination clearly exceeds the scope of Frye, which asks the court only to determine whether there is relevant scientific data and studies to support defendants’ causation theory. The court believes that defendants have met the requirements of Frye. The analysis does not end there, however. If it did, the defense would be permitted. For the reasons which follow, it cannot be.
Parker Analysis
The court turns next to examining the case under Parker, which asks “whether there is an appropriate foundation for the experts’ opinions, rather than whether the opinions are admissible under Frye.” (Parker at 447; see also Ratner at 72-73.) “ ‘The Frye inquiry is separate and distinct from the admissibility question applied to all evidence.’ ” (Lugo at 62, quoting Parker at 447 [other citations omitted].) Thus, “[t]he focus moves from the general reliability concerns of Frye to the specific reliability of the procedures followed to generate the evidence proffered and whether they establish a foundation for the reception of the evidence at trial.” (Id. at 63, quoting People v Wesley, 83 NY2d 417, 429 [1994].) This foundational inquiry by the court “should not include a determination of the court that such evidence is true. That function should be left to the jury.” (Id., quoting People v Wesley at 425.)
*926 Although Parker was a toxic tort case, its holding has been applied to medical malpractice cases. (See e.g. Lugo [hypoglycemia episode experienced by infant shortly after birth correlated to brain abnormality]; Muhammad at 1354 [brachial plexus injury case].) Muhammad adapted Parker’s causation test to a birth injury and devised the following: the causation expert must set forth the infant’s “ ‘exposure ... to a [harmful in útero event], that the [event] is capable of causing the particular [injury] (general causation) and that [the infant] was exposed to [a sufficiently harmful event] to cause the [injury] (specific causation).’ ” (Muhammad at 1354, citing Parker at 448; see also Lugo at 62-63.)
Defendants do not address that rubric in opposing this motion. Instead, they attempt to sidestep the issue by employing a “differential diagnosis,” in other words, they elect to establish causation by ruling out other possibilities to arrive at a conclusion. First, Dr. Grimm accepts Dr. Shanahan’s assertion that he did not employ excess lateral traction and rules that out as a possibility for the cause of Eduardo’s injury. She bolsters this conclusion by relying on the delivery notes that Eduardo was floppy upon delivery and had a muscle tone rated 1, although she lacks the medical expertise to evaluate the significance of that rating. She also ruled out a pre-labor cause for Eduardo’s injury. From this, she then concludes that, in the absence of excess lateral traction, and in light of Eduardo’s condition at birth, his injury was caused by the maternal forces of labor.
Plaintiffs argue that defendants cannot satisfy the causation requirements of Parker and Muhammad through these means. They claim that to prove the reliability of their theory, defendants must establish as a predicate for the theory that the mother had a contraction at 2:45 p.m. when the notes show that Eduardo’s shoulder came in contact with the pubic symphysis. Plaintiffs also state that the fact that the fetal monitoring strips show no contractions occurred after 2:30 p.m. and there was no evidence of maternal pushing from 2:40 p.m. onward provide no support for the maternal forces of labor theory in this case. Plaintiffs state that Dr. Grimm’s theory assumed a contraction because Eduardo’s head was delivered at 2:45 p.m. They argue that Dr. Grimm lacks the expertise to opine whether the delivery of Eduardo’s head was due to a contraction; therefore, without competent proof of a contraction, or any ability to quantify the strength of the contraction, defendants’ theory is without a proper foundation and must be rejected.
*927 The court acknowledges the Appellate Division’s admonition against rendering an assessment of the ultimate merit of the defense expert’s opinion. (See Lugo at 62-64.) In making its determination that defendants failed to meet the causation test in Parker and Muhammad, a legal test which this court is bound to apply, the court does not believe that it has assessed the merits of defendants’ expert’s opinion. Rather, upon a painstaking review of all of the submissions presented to it in the papers, the arguments of counsel, and in particular, the testimony at the hearing, this court believes that “there is simply too great an analytical gap between the data and the opinion proffered” (Ratner at 75, quoting General Electric Co. v Joiner, 522 US 136, 146 [1997] [other citation omitted]), to render it admissible at the trial of this action.
The causation theory at issue here is still evolving, as witnessed by the fact that Dr. Allen, the theory’s strongest opponent, has moved from an absolutist position to fully embrace the concept that temporary injury can result from the maternal forces of labor.[24] However, at this juncture, the data and underlying support for defendants’ theory that a permanent brachial plexus injury can result from the maternal forces of labor simply has not reached a sufficient point of reliability to meet the general causation prong of Parker and Muhammad. The data that Dr. Grimm relied upon to support her causation theory is insufficient for this purpose. (Ratner at 75.) The animal studies that Dr. Grimm used, by her own admission, have no human data with which to correlate their results, and therefore any attempted correlation is merely speculative.
Defendants also cannot overcome the fact that quantification of the injury threshold remains an impossibility, given the moral and ethical constraints imposed by our society against using live infants as guinea pigs. At present, this data can only be supplied through different types of modeling, each of which has its own shortcomings. Dr. Grimm’s computer modeling suffers from the significant limitation recognized in the medical literature that
“the model did not account for several confounding factors including soft tissue resistance, force dissipation throughout the uterus or the compound effect of traction and compression forces. Further crit *928 icism focused on the assumptions made for the impaction site and the wide range of contact pressures between the fetal neck and the symphysis pubis, which includes values that in real life exceed the fatal limits.” (S. Doumouchtsis and S. Arulkumaran, Is it possible to reduce obstetrical brachial plexus palsy by optimal management of shoulder dystocia?, 1205 Annals NY Acad Sci (Issue 1) 135 [Sept. 2010].)
The Lerner and Salamon case report, on which defendants rely heavily, provides tepid support for their theory. Aside from the cloud that remains over it even after the peer review, “[c]ourts have recognized that . . . observational studies or case reports are not generally accepted in the scientific community on questions of causation.” (Ratner at 76, quoting Heckstall v Pincus, 19 AD3d 203, 205 [1st Dept 2005], and citing Pauling v Orentreich Med. Group, 14 AD3d 357 [1st Dept 2005].) Similarly, the case reports of Erb’s palsy occurring in cases of atraumatic Cesarean section are also merely observational and two of those reported cases, as noted earlier, involved abnormal uterine cavities, which has no application to this case. Such observational data, which is recognized to be “of a lesser caliber than controlled clinical studies from which results can be reviewed and verified” (Ratner at 76), is insufficient to fill the analytical gap that exists in this case. Moreover, the cesarean section reports lend only indirect and weak support to the maternal forces theory, because their circumstances are so fundamentally different given the absence of shoulder dystocia.
Furthermore, turning to the medical literature on brachial plexus palsy, as plaintiffs correctly point out, the literature speculates about different causes of such injury but offers no answers beyond the theories they describe. As it turns out, there is still much mystery surrounding infant development and the birth process. The fact that our society’s moral and ethical constraints and the current limits of our technology prevent obtaining the data that might establish defendants’ causation theory does not mean that this court can overlook the analytic gap that currently exists. That gap is further widened by the scientific articles submitted by plaintiffs and the studies by Dr. Allen, which seriously call defendants’ theory into question.
Finally, the fact that defendants simply ignore the causation test set forth in Parker and Muhammad in favor of a differential diagnosis signals the inability of their theory to prove specific *929 causation in this case. While a differential diagnosis may be employed in an appropriate case to establish causation, as it was in the mold exposure case cited by defendants (Cornell v 360 W. 51st St. Realty, LLC, 95 AD3d 50 [1st Dept 2012]), unlike mold exposure, the medical literature does not support the premise advanced herein by defendants that the maternal forces of labor can cause a permanent brachial plexus injury. (Id. at 61 [explaining application of differential diagnosis matrix to establish causation], citing Marso v Novak, 42 AD3d 377 [1st Dept 2007], lv denied 12 NY3d 704 [2009] [wherein the Court “rejected an expert’s opinion as to causation, arrived at through differential diagnosis, not because the differential diagnosis was an unreliable methodology, but because the medical literature did not support the premise that bradycardia was a risk factor for the type of stroke suffered by the plaintiff’ (Cornell at 61)].) The use of a differential diagnosis to establish causation has no place unless the cause that is left standing after all other causes are ruled out has an established link to the injury.[25]
Dr. Grimm admits that she has not applied her computer model to this particular birth and that she could not directly correlate brachial plexus strain to brachial plexus injury in a given individual. It is clear to the court that at the moment when it became necessary to tie their causation theory to this particular case, defendants realized that the theory simply could not hold water on these facts and opted instead for a differential diagnosis. It is plain that Dr. Grimm cannot make the causal connection between the maternal forces of labor at play during Eduardo’s birth and the injury he suffered. It is at this point that defendants’ theory gives way to sheer speculation. Without passing on the ultimate merit of that theory, the court finds that defendants have failed to meet the general and specific prongs of the Parker and Muhammad causation test.
Accordingly, plaintiffs’ motion to preclude defendants’ theory of causation is granted. The court has fully considered all other *930 issues raised herein and determined that they do not warrant different result.

. The action against St. Anthony Community Hospital was discontinued by stipulation dated February 15, 2011.

. Plaintiffs allege that shoulder dystocia is documented in the medical records of Eduardo’s delivery.

. The “turtle sign” refers to the sudden retraction of the fetal head against the mother’s perineum after it emerges from the vagina. It occurs when the infant’s anterior shoulder is caught on the back of the maternal pubic bone.

. The McRoberts’ maneuver, which involves sharply flexing the mother’s legs up on her abdomen to rotate the symphysis pubis and straighten the sacrum, is recommended “as the initial technique for disimpaction of the anterior shoulder.” (R.B. Gherman, T.M. Goodwin, I. Souter, K. Neumann, J.G. Ouzounian and R.H. Paul, The McRoberts’ maneuver for the alleviation of shoulder dystocia: how successful is it?, 176 Am J Obstetrics & Gynecology [Issue 3]) 656 [Mar. 1997].)

. “The Apgar score is a screening test used worldwide to quickly assess the health of an infant one minute and five minutes after *912 birth. The 1-minute Apgar score measures how well the newborn tolerated the birthing process. The 5-minute Apgar score assesses how well the newborn is adapting to the environment. Virginia Apgar, M.D. (1909-1974) introduced the Apgar score in 1952.” (University of Maryland Medical Center, Apgar Score, http ://umm. edu/health/medical/pregnancy/labor-and-delivery/ apgar-score#ixzz2jtB082g2.)

. “A brachial plexus injury is an injury to the brachial plexus — the network of nerves that sends signals from your spine to your shoulder, arm and hand. A brachial plexus injury occurs when these nerves are stretched or, in the most serious cases, torn. This happens as [a] result of your shoulder being pressed down forcefully while your head is pushed up and away from that shoulder.” (Mayo Clinic Staff, Definition, www.mayoclinic.com/health/ brachial-plexus-injury/DS00897.)
“A brachial plexus injury occurring during birth is called birth related brachial plexus palsy or obstetric brachial plexus palsy. . . .
“Obstetric brachial plexus palsy ... is most common when there is difficulty delivering the baby’s shoulder. During delivery, the baby’s shoulder may become impacted on the mother’s pubic bone causing the brachial plexus nerves to stretch or tear (shoulder dystocia).” (Johns Hopkins Medicine, Brachial Plexus Injury, www.hopkinsmedicine.org/neurology_neurosurgery/ specialty_areas/peripheral_nerve_surgery/conditions/ brachial_plexus_injury_bpi.html.)

. Erb’s palsy refers to “an injury of the upper brachial plexus nerves leading to loss of motion around the shoulder and ability to flex the elbow.” (Johns Hopkins Medicine, Brachial Plexus Injury, www.hopkinsmedicine.org/ neurology_neurosurgery/specialty_areas/peripheral_nerve_surgery/conditions/ brachial_plexus_injury_bpi.html.)

. Indeed, it has been noted in the medical literature that “[bjrachial plexus palsy is commonly attributed to excessive lateral traction applied to the fetal neck by the physician during attempts to free the shoulder from behind the symphysis pubis.” (Robert B. Gherman, T. Murphy Goodwin, J. Ouzounian, D. Miller and R.H. Paul, Brachial plexus palsy associated with cesarean section: An in útero injury ?, 177 Am J Obstetrics & Gynecology [Issue 5] 1162 [Nov. 1997].)

. For more than 25 years, Dr. Allen has performed collaborative research with obstetricians specializing in high-risk births of shoulder dystocia and related mechanical injuries. He has written a great deal on the subject of shoulder dystocia and brachial plexus injuries, with many of his articles being subject to peer review.

. Frye states that “while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.” (293 F at 1014.)

. “Brachial plexus injuries are categorized according to the type of trauma experienced by the nerve. The following are the types of brachial plexus injuries:
“• Avulsion — this means the nerve has been pulled out from the spinal cord and has no chance to recover.
“• Rupture — this means the nerve has been stretched and at least partially torn, but not at the spinal cord.
“• Neurapraxia — this means the nerve has been gently stretched or compressed but is still attached (not torn) and has excellent prognosis for rapid recovery
“• Axonotemesis — this means the axons (equivalents of the copper filaments in an electric cable) have been severed. The prognosis is moderate.
“• Neurotemesis — this means the entire nerve has been divided. The prognosis is very poor.
“• Neuroma — this refers to a type of tumor that grows from a tangle of divided axons (nerve endings), which fail to regenerate. The prognosis will depend on what percentage of axons do regenerate.” (Johns Hopkins Medicine, Brachial Plexus Injury, www.hopkinsmedicine.org/neurology_neurosurgery/ specialty_areas/peripheral_nerve_surgery/conditions/ brachial_plexus_injury_bpi.html.)

. Defendants have not cross-moved to preclude plaintiffs from introducing evidence to support their theory of causation. Therefore, to the extent that defendants seek affirmative relief, the court will not consider defendants’ arguments challenging plaintiffs’ causation theory or the basis for the theory.

. Henry M. Lerner and Eva Salamon, Permanent brachial plexus injury following vaginal delivery without physician traction or shoulder dystocia, 198 Am J Obstetrics & Gynecology (Issue 3) e7 (Mar. 2008).

. B. Gonik, N. Zhang and M. Grimm, Defining forces that are associated with shoulder dystocia: The use of a mathematic dynamic computer model, 188 Am J Obstetrics & Gynecology (Issue 4) 1068 (Apr. 2003).

. Robert B. Gherman, T. Murphy Goodwin, J. Ouzounian, D. Miller and R.H. Paul, Brachial plexus palsy associated with cesarean section: An in útero injury ?, 177 Am J Obstetrics & Gynecology (Issue 5) 1162 (1997).

. Costantino v David M. Herzog, M.D., P.C., 203 F3d 164, 168 (2d Cir 2000) (“another learned treatise — Williams Obstetrics”).

. Precis: An Update in Obstetrics and Gynecology: Obstetrics (2005).

. Dr. Grimm stated that Dr. Allen varied the size of the model infant’s shoulders to insure that the shoulder would come into contact with the model mother’s pelvis. (Grimm hearing tr at 47, lines 13-25.)

. The court notes that the official transcript refers to nerve “routes,” using the homonym for “roots.”

. As Justice Saxe opined in Marsh, “a theory about the mechanism of an injury will not prompt the profession generally to weigh in with its own studies or publications on the subject” (at 312). In the case of brachial plexus palsy, however, the profession has weighed in with its own studies and articles about the mechanism of injury.

. The Lerner study was challenged because Dr. Salamon denied that there was shoulder dystocia, yet the delivery room nurse noted “mild shoulder dystocia” in the chart. (Notice of motion, exhibit L.)

. Lacking the requisite medical expertise, this court cannot sit in judgment of the peer review committee to arrive at its own conclusion about the validity of the case study.

. The authors acknowledged that two of the cases involved “abnormalities of the uterine cavity.” (Id.)

. R.H. Allen and E. Gurewitsch, Temporary Erb-Duchenne palsy without shoulder dystocia or traction to the fetal head, 105 Obstetrics & Gynecology (Issue 5) 1210 (May 2005).

. The Colorado case (Estate of Ford v Eicher, 250 P3d 262 [Colo 2011]) cited by defendants to support applying a differential diagnosis to a brachial plexus injury is inapposite. The Colorado court did not address whether a differential diagnosis was appropriate; instead, it considered whether the proper evidentiary standard was applied to exclude the expert’s testimony proffering the maternal forces theory. It is also worth noting that the cited authority from other jurisdictions generally applies the more liberal evidentiary standard of Daubert v Merrell Dow Pharmaceuticals, Inc. (509 US 579 [1993]).